# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00777-CV

D. R., Appellant

v.

Texas Department of Family and Protective Services, Appellee

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-20-006808, THE HONORABLE MADELEINE CONNOR, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following a jury trial, the district court terminated the parental rights of appellant D.R. (Mother) to her daughter, two-year-old J.P.D.H. (Daughter).[1] In a single issue on appeal, Mother asserts that the evidence is legally and factually insufficient to support the district court's finding that termination of her parental rights was in Daughter's best interest. We will affirm the termination decree.

## BACKGROUND

The case began in November 2020, when the Texas Department of Family and Protective Services (the Department) received a report alleging that Mother had contacted law enforcement in response to Mother's boyfriend, J.H. (Boyfriend), "terroriz[ing] the family" and

---

[1] For the child's privacy, we refer to her, her mother, and others by their initials and by their relationships to each other, and we refer to the child's approximate age at the time of trial. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

"threaten[ing] to murder the family" at the home of Mother's mother (Grandmother).[2] While the investigation into that incident was ongoing, the Department received another report that on December 4, 2020, Mother drove to Boyfriend's home to drop off Daughter for the night when she discovered that Boyfriend "had his girlfriend in [his] vehicle." Mother became "upset and rammed [Boyfriend's] car with her vehicle while Daughter was inside her vehicle" and then fled the scene.

Following its investigation into these and other reports of domestic violence between Mother and Boyfriend, the Department sought and obtained temporary managing conservatorship of Daughter and filed its petition seeking termination of Mother's parental rights.[3] The case proceeded to a jury trial in May 2022. Witnesses who testified included Mother; Laura Pender, the Department conservatorship worker assigned to the case; B.W., Mother's cousin and Daughter's foster mother at the time of trial (Foster Mother); Deborah Smith, the Court Appointed Special Advocate (CASA) volunteer assigned to the case; Meredith Wesley, the CASA supervisor assigned to the case; Krystal Humphrey, a licensed professional counselor who provided counseling services to Mother during the case; and two police officers, one who responded to an assault by Mother against Boyfriend in January 2020, and the other who responded to an assault by Boyfriend against Mother in February 2020.

At the conclusion of trial, the jury found by clear and convincing evidence that Mother had: (1) knowingly placed or knowingly allowed Daughter to remain in conditions and

---

[2] These allegations are contained within the Department's removal affidavit, a copy of which was not admitted into evidence but has been included in the clerk's record. We refer to it only to the extent necessary to understand the background of this case.

[3] When the case began, Boyfriend was the alleged father of Daughter, and the Department also sought to terminate his parental rights to Daughter. However, DNA testing later established that Boyfriend was not the father.

surroundings which endangered her physical and emotional well-being; (2) engaged in conduct or knowingly placed Daughter with persons who engaged in conduct which endangered her physical and emotional well-being; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Daughter. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The jury also found by clear and convincing evidence that termination of Mother's parental rights was in Daughter's best interest. *See id*. § 161.001(b)(2). The district court rendered judgment consistent with the jury's verdict and later signed its decree terminating Mother's parental rights. Mother filed a motion for new trial that was overruled by operation of law. This appeal followed.

## STANDARD OF REVIEW

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final,

3

irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

However, "an appellate court's review must not be so rigorous that the only fact-findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id*. "Just as it is imperative for courts to recognize the constitutional

4

underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id*.

## DISCUSSION

**Applicable law**

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). In this case, Mother challenges only the best-interest determination, and thus we limit our review to that finding. *See* Tex. R. App. P. 47.1.

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence

5

[was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at \*11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

**Evidence presented**

The Department presented evidence of two incidents of domestic violence between Mother and Boyfriend that occurred before the case began. The first incident occurred in January 2020. Officer Ashley Fuller of the Austin Police Department (APD) testified that she was dispatched to a hotel following a call by a pizza-delivery driver, who stated "that she had made a delivery to this hotel room in which a female inside tried to attack her, and that female was also trying to attack and did assault a male in the room." The female was later identified as Mother and the male as Boyfriend. When Fuller arrived at the hotel, she was greeted by Boyfriend, who was then alone in the room. Boyfriend "didn't really want to cooperate too much," "didn't want [Mother] to get in any trouble," and "didn't want to allow me to photograph any of his injuries or complete any paperwork," but Boyfriend did explain to Fuller what had happened. Fuller testified that Boyfriend told her that "he was ordering pizza for them and that during this time, they started arguing about how money was spent for the other children" and that "[Mother] just became irate [and] very upset, in his words, that she lost it and just started hitting him all over." Fuller observed "several scratch marks to his left arm, his bicep area," "a scratch on his face by his lip," and "little puncture wounds on his rib cage and on his back that he said

6

were from a wine bottle corkscrew opener." Fuller testified that Boyfriend identified Mother as his girlfriend and that the offense report characterized the incident as an "assault with injury, family violence."

The second incident occurred in February 2020. APD Officer Eric Pastor testified that he responded to a call that "started out as a disturbance and turned into what [officers] called a gun hotshot," which is "when a gun is seen or being used in the disturbance." When Pastor arrived at the scene, there were "three subjects, two females, one male, outside of a vehicle." The male subject, identified as Boyfriend, had been reported as having a gun, so Pastor frisked him for weapons and determined that he did not have any weapons on him. Pastor later learned that the 911 caller had reported that a gun was involved in the disturbance because Boyfriend was "known to carry a firearm, but none were actually seen that day."

One of the two female subjects was identified as Mother, and Pastor "observed several abrasions to her face." Mother explained to Pastor that she had been involved in a "verbal altercation" with Boyfriend while they were driving in their vehicle. The argument involved Boyfriend's relationships with other women, and the altercation eventually "turned physical," with Boyfriend striking Mother several times. Boyfriend also "attempted to get her in a headlock, was unsuccessful, then grabbed her hair and tried to yank her across the center console from the passenger seat towards the driver seat," before the other female subject, who was in the vehicle with them, intervened and "was able to step in," "break the two apart," and call 911. During their interviews with the police following the incident, Boyfriend and Mother described themselves as "common law spouses as well as parents of the same child," and Mother reported that they had been together for approximately one year. Based on the information

obtained during the interviews with the subjects, the police arrested Boyfriend for "assault with injury, family violence, and interference with [an] emergency phone call."

Pastor further testified that after Boyfriend was transported to jail, Mother "brought up a prior incident that occurred." Specifically, "several days after [Daughter] was born," Boyfriend "allegedly pulled a firearm on [Mother], loaded a round into the chamber and pointed the gun directly into [Mother's] chest area." Mother told Pastor that Daughter was present during this incident. Pastor explained that this "was a late report so there was nothing that we could file that day, but another incident report was completed and sent off to the detectives." Pastor also filed an emergency protective order against Boyfriend on Mother's behalf.

Boyfriend was in jail until October 2020, and following his release, he visited Daughter on Halloween at Grandmother's house, where he allegedly threatened Grandmother. This case began after that incident. Department caseworker Laura Pender, who was assigned to the case in December 2020, testified that the Department had received a referral regarding domestic violence between Mother and Boyfriend, who the Department believed to be Daughter's father at the time. Pender noted that Mother had "a previous CPS case about six to eight months before that time,"[4] and the Department had observed "a pattern of [Mother] continuing to be with [Boyfriend] and [Daughter] being around."

Pender explained that in January 2021, she created "a family strength and needs assessment [FSNA] for the parents . . . based on the current allegations of the domestic violence and history that we were aware of," and then created another FSNA in February 2021 after

---

[4] The previous CPS case, discussed in the removal affidavit, was related to the February 2020 assault of Mother by Boyfriend.

8

receiving more information from Mother. Based on that assessment, Pender created a family service plan for Mother, which included requirements that Mother actively participate in and successfully complete a nurturing-parent program, complete a psychological evaluation, submit to random drug testing, and participate in and complete domestic-violence and protective-parenting classes.

Pender testified that when she first met with Mother to discuss her services, which were primarily focused on addressing domestic violence, Mother "stated that she and [Boyfriend] were working on their relationship and denied that he had pointed a gun at her, but did say that in February of 2020, that he had hit her on her face and that she had defended herself." Pender informed Mother about SAFE Alliance, an organization that "could possibly help with housing for her." Pender explained that she had referred Mother to SAFE Alliance because the Department "wanted to make sure that she had a safe place to be while she was working her services," as the Department's main concern was domestic violence between Mother and Boyfriend. At that time, Mother did not appear to believe that domestic violence was an issue in her relationship with Boyfriend. Pender recounted that at the initial permanency hearing, at which both Mother and Boyfriend had appeared remotely, Mother and Boyfriend "stated that they wanted their visits together, that they were a couple and both continued to deny domestic violence."

Pender recounted that Mother's visits with Daughter during the case were inconsistent: "She would have periods of time where she would go often, you know, consistently every week, and then sometimes she would go weeks at a time without visiting." Pender also testified that Mother's visits were always supervised and that she never progressed to unsupervised visits.

When the case began, Mother and Boyfriend had visited Daughter together. Then, in June 2021, Mother told Pender that "she was no longer in a relationship with [Boyfriend] and she wanted her visits separated and that she wanted him to do paternity testing." Boyfriend agreed to take a DNA test and was determined not to be the father of Daughter. The Department then asked another man who Mother had identified as the possible father to take a paternity test, and he too was found not to be the father. Pender testified that at the time of trial, Daughter's father had not been identified.

Regarding Mother's communication with the Department, Pender testified that "[s]ometimes [Mother] was very consistent with staying in contact and then sometimes she was not." Pender added, "She's probably changed her number six to seven times, so it would just depend when she would reach out to me with a new number or—or how she would stay in contact."

Pender testified that she had visited Grandmother's home, which was where Mother claimed to live during the case, and Pender had "no concerns" regarding the safety of that home. However, Pender was not sure whether Mother still lived there, as Grandmother had told her in February 2022 that Mother "did not live there." Pender also explained that Grandmother had "significant CPS history" and an "extensive criminal history," so she had not been approved as a placement for Daughter.

Pender testified that Mother had completed domestic-violence classes and protective-parenting classes but not other services, including the nurturing-parenting course, the psychological evaluation, and submitting to random drug tests. Pender was concerned that Mother "hasn't demonstrated that she understands how domestic violence can affect her child" because she continues to associate with Boyfriend. Pender explained,

10

In January of 2022, when I spoke to [Boyfriend], he stated that [Mother] had come over with [Daughter] and then it's just been reported to the Department that recently, within the last month, [Mother] and [Boyfriend] have arrived at [Foster Mother's] apartment together to visit [Daughter]. And so it appears that she's still either friends or in a relationship or in contact, at least, with [Boyfriend], who has tried to kill her, which is not safe.

Pender further testified as to Daughter's placements during the case. Pender recounted that Daughter was first placed with Boyfriend's mother, who "asked us to remove the child from her care, stating it was too stressful to be involved with CPS and she did not wish to do it any longer." Daughter was then placed briefly in a non-relative foster home and then with Foster Mother, who was Daughter's placement at the time of trial.

Pender had observed interactions between Daughter and Foster Mother and described their relationship as "bonded." Daughter "looks to [Foster Mother] for comfort and care, for guidance . . . for approval . . . and goes to her if she needs water or a drink or food." Pender testified that the Department's plan was for Foster Mother to adopt Daughter.

The Department did have one concern with Foster Mother during the case. Pender recounted an incident of domestic violence between Foster Mother and her partner at Foster Mother's home in January 2022. Mother was visiting Daughter there at the time. When the police arrived to investigate the incident, Foster Mother's partner claimed that Foster Mother was the aggressor, and the police arrested her. Before she was transported to jail, Foster Mother asked Mother to take care of Daughter, and Mother took her. This occurred on a Friday night, and when on-call workers for the Department learned what had happened, they attempted to locate Mother and Daughter over the weekend but were unable to do so.

Then, on Monday morning, Pender was notified about what had happened and contacted Mother, who "refused to allow [Pender] to see [Daughter]." Pender "submitted a

11

missing person report with APD, called the National Missing Children Hotline, and was very close to having to issue an Amber Alert." However, around 10:00 p.m. that night, Pender received a text message from Foster Mother "stating that [Mother] had picked her up from jail and [Daughter] was safe and with her. So [Pender] was able to see [Daughter] the next day with [Foster Mother]."

Pender testified that following this incident, the Department implemented a safety plan with Foster Mother. The requirements of this plan, a copy of which was admitted into evidence, were that Daughter "not be alone in anyone's care except [Foster Mother] and daycare personnel," that Foster Mother "will not engage in any criminal activity," that "[i]f an emergency occurs and [Foster Mother] requires a safe person to care for [Daughter] in her absence, [Department designated person] is authorized," that Daughter "must attend daycare Monday-Friday," that "if [Daughter] will miss daycare, [Foster Mother] must provide the Department with a doctor's note," that Foster Mother "will complete the process she has started to file a Protective Order against [former partner]," and that "[a]ny partner that [Foster Mother] has in the future must complete a background check." When asked why the Department was willing to leave Daughter in Foster Mother's care, Pender explained,

> [Daughter] is two years old and she has already moved four times. And so to avoid another traumatic removal, we attempted to save the placement because [Foster Mother] doesn't have a violent history that we know about, and so with the safety plan in place, we believed that she could follow the safety plan and keep [Daughter] safe.

Pender testified that to her knowledge, Foster Mother had not violated the safety plan. Pender explained that Foster Mother "was no longer in a relationship with the man that that incident occurred with," that she had enrolled Daughter in daycare, and that "[s]he attempted to get the

12

protective order against" the partner but was unable to do so "because she was listed as the aggressor." Pender testified that Foster Mother's actions had alleviated the Department's concern regarding the domestic-violence incident, and the Department had no other concerns regarding Foster Mother. Pender added that Foster Mother "has an approved home study, and any concerns that may come up, we can ask for waivers and other ways to help her get licensed to adopt."

On the other hand, the Department still had concerns regarding Mother, specifically her continuing contact with Boyfriend and the possibility that she was using illegal drugs, which the Department was unable to rule out because of Mother's refusal to take drug tests.[5] Additionally, Pender testified that after the second day of trial, Mother had sent a "hostile text message" to Foster Mother, "calling her names and stating that she did wrong by going against [Mother], that the Department was just going to take [Daughter] from her and that she just should not have testified against [Mother]." Pender also testified that "[t]he pattern of criminal activity with [Mother] is years long of poor choices causing her to be involved with law enforcement, and [Foster Mother] does not have a pattern of criminal activity."

Foster Mother testified that she had been Daughter's caregiver for approximately one year and that she loved her and was bonded to her. Daughter called Foster Mother "Mom," and Foster Mother called Daughter "Baby." Foster Mother recounted that when Daughter first came into her care, Daughter "started off pretty timid and standoffish and quiet, but she, like, opened up really fast. She was super smart and energetic and happy." Foster Mother described

---

[5] As we explain below, there was evidence presented during Foster Mother's testimony that Mother might have used illegal drugs during the case.

her typical day with Daughter: "We get up, we eat breakfast, we sing all the time. I think she's going to be some type of singer. We color, we play with dolls. Sometimes we go outside."

Foster Mother testified that she was currently unemployed. However, because Daughter was about to start daycare, Foster Mother believed "that will open up my schedule for me to be able to get back into the working field." She explained, "I have job interviews and offers lined up. I just didn't get those—I mean, I just didn't take anything right away because I didn't have a stable [baby]sitter at the time." Foster Mother added that until she finds a job, she has money saved, her bills were paid, and her "rent is paid up for the next five months."

Foster Mother acknowledged that while Daughter lived with her, she had once gone to jail for an altercation between her and her then-partner that "got a little physical," but she testified that she was no longer in a relationship with that man. She explained that during the altercation, Mother had been visiting Daughter, and when the police arrived and arrested Foster Mother, she gave Daughter to Mother, believing that Mother would keep Daughter safe. When Foster Mother got out of jail three or four days later, she voluntarily agreed to a safety plan with the Department because she "wanted to show them whatever I needed to do to make sure that [Daughter] was going to be safe, that's what I would do."

Foster Mother testified that Mother and Boyfriend were in a "back and forth" relationship during the case and that since Daughter had been in Foster Mother's care, she had seen them together between six and eight times. Foster Mother further testified that Mother had admitted to her that she used methamphetamine. To document that Mother did so, Foster Mother had taken screenshots of Mother on Facetime smoking some sort of substance through what appeared to be a glass pipe, and copies of those screenshots were admitted into evidence. Foster

14

Mother testified that she was hesitant to share those photos with the Department "[b]ecause at the end of the day, [she] know[s] that [Mother] loves her daughter."

Foster Mother testified that if Mother's rights were terminated, she would be willing to adopt Daughter. Foster Mother hoped that "at some point . . . she and [Mother] would be able to, you know, at least coexist with each other" for Daughter's sake, even though they were currently not talking to each other. She also testified that if she adopted Daughter, she would allow Mother to have contact with Daughter because Daughter "needs to know who her mom is." Foster Mother had supervised several visits between Mother and Daughter and had observed that the visits went well. However, Foster Mother testified that she would not allow Mother to see Daughter if Mother were ever under the influence of drugs. Foster Mother testified that she did not use drugs, despite an accusation by Mother that she did, and she had voluntarily agreed to take a drug test after she testified.

Mother, during her testimony, recounted her history with Boyfriend, including the incident in February 2020 when Boyfriend was arrested for assaulting Mother. When asked to explain what had happened during that incident, Mother testified that it was "a sensitive subject" and that she would "rather not go into detail." However, she acknowledged that Boyfriend "does get very violent with" her and that he "put his hands" on her during that incident.

Mother also provided more information regarding the incident that prompted this case. She testified that after Father got out of jail in October 2020 for the February assault, he visited Daughter at Grandmother's house on Halloween, with Grandmother's permission. When Mother "showed up to pick [Daughter] up the next day, [Boyfriend] was still there, of course, and then he started arguing and fussing with" Mother, who "asked him to leave" and "called the cops" when he refused. Mother testified that this was the only occasion between October and

15

December 2020 when she saw Boyfriend. Mother denied that she was ever in a relationship with Boyfriend, testifying that she was only "getting to know him" during the time when they were dating, and she denied ramming her vehicle into Boyfriend's vehicle on December 4, 2020, testifying that she "didn't have a car in December" and that she was "out of town" that day. However, Mother acknowledged that she had anger issues.

On December 7, 2020, Mother was stopped for speeding and arrested for violating her probation for an aggravated assault that she had committed in 2018, and she was in jail for that violation until January 8, 2021. Mother admitted that she had another "brush with the law" in March 2021, when she was arrested along with her sister for organized criminal activity, which Mother testified was later downgraded to a theft charge. Mother testified that she had also been arrested for the vehicle-ramming incident and for allegedly kidnapping Daughter during the incident discussed above when Foster Mother gave Daughter to her. According to Mother, both of those charges had been dismissed.

Mother testified that she did not remember certain events that occurred before and during the case, including some of her meetings with the Department, because she suffered from "short-term memory loss" due to a "brain tumor in [her] pituitary glands" that she was not currently treating. Regarding her court-ordered services, Mother testified that she completed domestic-violence classes, protective-parenting classes, and eight out of sixteen sessions of the nurturing-parenting course. Mother acknowledged that she never took a psychological evaluation and conceded that she did not take any drug tests and had been unsuccessfully discharged from individual therapy with two therapists.

Mother further acknowledged that she had spoken to Boyfriend on the phone in January 2022 but testified that they "don't really see each other" anymore, although she admitted

that she saw him in February 2022, when her niece died. Mother also testified that Boyfriend had called her within one month before trial.

Regarding her relationship with Daughter, Mother testified that she and Daughter "always had a bond" and were "inseparable." Mother explained that Grandmother and other family members had provided her and Daughter with emotional and financial support and that those family members were actively involved in Daughter's life. Mother testified that she was currently living with Grandmother in Austin and that she had been working "[o]ff and on" for nine months at a fast-food restaurant. If Daughter were returned to her, Mother's plan was to continue living with Grandmother.

Mother testified that she and Foster Mother "had a good bond," even though they occasionally argued like members of "a typical family do." Mother added, "We're like sisters. One day we might argue, the next day I'm at the door like, hey, I have a gift for you." Mother denied sending Foster Mother a threatening text message after Foster Mother had testified against her. Mother also testified that she had provided financial support to Foster Mother and had provided food and clothing to Daughter while she was in Foster Mother's care.

Licensed professional counselor Krystal Humphrey discussed the counseling services she provided to Mother during the case. Humphrey testified that she had established several therapy goals with Mother that were focused on addressing Mother's issues with domestic violence and anger management, but Mother was never able to complete those goals and was unsuccessfully discharged from therapy. Humphrey attributed the lack of success to Mother's "inconsistent attendance" and "disengagement" that prevented Humphrey from "being able to really track the progress" that Mother had made. Copies of Humphrey's therapy notes and her discharge summary were admitted into evidence. In the discharge summary, one of

17

Humphrey's diagnostic impressions of Mother was that she suffered from "intermittent explosive disorder," which Humphrey described in her testimony as an "inability to manage anger in the moment. It is sudden, often explosive, can be violent physically or verbally, in essence, kind of a ticking time bomb."

CASA volunteer Deborah Smith, who was appointed to this case in February 2022, testified that she had two face-to-face meetings with Foster Mother and Daughter and that they both "went great." Smith observed that Daughter appeared bonded to Foster Mother and "definitely looks to [Foster Mother] for guidance and approval." Smith also visited Foster Mother's home and had no safety concerns with it. Smith testified that CASA did have concerns with Foster Mother's financial stability but was "encouraged with the fact that [Daughter] will be starting day care, that this will free up her time to look for that stability, that—that job." Smith also testified that CASA was encouraged by Foster Mother's "willingness to submit a drug test, and hopefully come[] back clean."

Smith testified that she "talked a couple times" over the phone with Mother and "exchanged a few text messages" with her. Smith was concerned with Mother's refusal to submit to drug tests and to complete counseling services and her inability to make "the necessary choices" and sacrifices to ensure Daughter's safety. Smith testified that CASA believed that it was in Daughter's best interest to be adopted by Foster Mother and not to be returned to Mother, due to Mother's lack of participation in some of the services that were offered to her. CASA supervisor Meredith Wesley testified similarly that CASA was recommending termination of Mother's parental rights because in its view, the concerns identified at the beginning of the case were still present and Mother failed to complete her services.

18

**Analysis**

In arguing that the evidence is insufficient to support the finding that termination of her parental rights is in Daughter's best interest, Mother points to evidence showing that: (1) Mother and Daughter are bonded to each other and Mother loves Daughter; (2) Foster Mother was an unsafe and unstable placement for Daughter, due to the domestic-violence incident, her possible drug use, and her unemployment at the time of trial; (3) Mother continued to provide for Daughter's needs while the case was ongoing, including by taking care of Daughter when Foster Mother was arrested; and (4) Mother completed some of her services, including domestic-violence classes and protective-parenting classes.

Although we agree that the above evidence is contrary to the finding that termination of Mother's parental rights is in Daughter's best interest, particularly the evidence related to the safety and stability of Foster Mother as Daughter's placement,[6] ample evidence in the record establishes that termination of Mother's parental rights was in Daughter's best interest. This evidence includes: (1) the history of domestic violence between Mother and Boyfriend, which included an altercation in which Mother assaulted Boyfriend, an altercation in which Boyfriend struck Mother several times in their car, and an incident in which Boyfriend, in

---

[6] Although we cannot consider any post-trial developments in our sufficiency review, which is limited to the evidence that was adduced at trial, *see D.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00454-CV, 2021 WL 822491, at *6 (Tex. App.—Austin Mar. 3, 2021, no pet.) (mem. op.); *cf. Marines v. State*, 292 S.W.3d 103, 106 & n.1 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd), we note that in a post-judgment hearing, the attorney ad litem for Daughter stated that Foster Mother's drug test "did not come back favorably." This prompted the Department to remove Daughter from Foster Mother and place her in non-relative foster care. Based on the unfavorable test result, the district court indicated that it believed Foster Mother had committed perjury during her testimony, declared a mistrial, and set a new trial date, which was the subject of a separate mandamus proceeding. *See In re Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00618-CV, 2022 WL 16530863, at *2 (Tex. App.—Austin Oct. 28, 2022, orig. proceeding) (mem. op.) (conditionally granting mandamus relief).

19

the presence of Daughter, "allegedly pulled a firearm on [Mother], loaded a round into the chamber and pointed the gun directly into [Mother's] chest area"; (2) Mother continuing to be in a relationship and have contact with Boyfriend while the case was ongoing, despite their history of domestic violence and despite Mother being aware that domestic violence was the Department's primary concern; (3) Mother's multiple arrests while the case was ongoing, including for incidents in which she allegedly rammed her vehicle into Boyfriend's vehicle and allegedly engaged in either organized criminal activity or theft; (4) Foster Mother's testimony that Mother had admitted to her that she used methamphetamine, photographic evidence suggesting that Mother smoked some type of substance, and Mother's refusal to take drug tests to dispel the Department's concerns that she used illegal drugs; (5) Mother's admitted anger issues and her therapist's belief that Mother suffered from "intermittent explosive disorder," which the therapist described as an "inability to manage anger in the moment" that "is sudden, often explosive" and "can be violent physically or verbally, in essence, kind of a ticking time bomb"; (6) Mother's failure to complete all her services, including a nurturing-parenting course and a psychological evaluation; (7) Mother's unsuccessful discharge from two different therapists, one of whom attributed Mother's lack of success to Mother's "inconsistent attendance" and "disengagement" that prevented Humphrey from "being able to really track the progress" that Mother had made; (8) Mother's "inconsistent" visits with Daughter, which the Department caseworker testified never progressed from supervised to unsupervised, and her sometimes inconsistent communication with the Department; (9) Mother's refusal, according to the Department caseworker, to return Daughter to the Department when Foster Mother had improperly given Mother possession of Daughter, which led to Mother being arrested for kidnapping; and (10) Mother's uncertain living situation and unstable employment at the time of

20

trial, with Mother claiming to live with Grandmother but Grandmother telling the Department that Mother no longer lived with her, and Mother having been employed "off and on" for the past nine months.

Viewing the above evidence in the light most favorable to the finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Mother's parental rights was in the best interest of Daughter. Therefore, the evidence is legally sufficient to support the best-interest finding. Similarly, in light of the entire record, we cannot conclude that the evidence contrary to the finding is "so significant" that the factfinder could not have formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of Daughter. Accordingly, the evidence is also factually sufficient to support the best-interest finding.

We overrule Mother's sole issue on appeal.

## CONCLUSION

We affirm the district court's termination decree.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Baker and Triana

Affirmed

Filed:   April 27, 2023

21